## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

CHERYL REED and
MICHAEL WILLIAMS,

            Plaintiffs,

            v.                                            Case No.  2:15-cv-57

STEVEN NEIHEISEL, in his official and
individual capacity, AUBREY KALL, in her
official and individual capacity, PEARL
GAIDELIS, in her official and individual
capacity, ERIC LAKSONEN, in his official
and individual capacity, and TROY MORRIS,
in his individual and official capacity,

            Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Michael Williams and Cheryl Reed, by and through their counsel, request the immediate intervention of the Court to enjoin an ongoing violation of their constitutionally protected rights by Defendants. In support of their Complaint, Plaintiffs state and allege as follows:

### PARTIES

1.      Plaintiff Michael Williams ("Williams") is a citizen of the United States who resides in Michigan.  Williams is the Managing Editor for *The North Wind* student newspaper at Northern Michigan University ("NMU" or the "University").

2.      Plaintiff Cheryl Reed ("Reed") is a citizen of the United States who resides in Michigan.  Reed is an Assistant Professor in the Department of English at Northern Michigan University and is the Journalistic Advisor to *The North Wind* student newspaper at NMU.

3.     Defendant Steven Neiheisel ("Neiheisel") is a citizen of the United States who resides in Michigan. Neiheisel is employed by the State of Michigan as Vice President for Enrollment Management and Student Services of NMU, a Michigan state institution, and is a member of the Board of Directors (the "Board") of *The North Wind* student newspaper. As vice president, Neiheisel reports directly to the President of the University, Fritz Erickson ("Erickson").

4.     Defendant Aubrey Kall ("Kall") is a citizen of the United States who resides in Michigan. Kall is a student at NMU and an appointed member of the Board of *The North Wind*. During the ongoing 2014-15 academic year, Kall has served as Chair of the Board.

5.     Defendant Pearl Gaidelis ("Gaidelis") is a citizen of the United States who resides in Michigan. Gaidelis is a student at NMU and an appointed member of the Board of *The North Wind*.

6.     Defendant Erik Laksonen ("Laksonen") is a citizen of the United States who resides in Michigan. Laksonen is a student at NMU and an appointed member of the Board of *The North Wind*.

7.     Defendant Troy Morris ("Morris") is a citizen of the United States who resides in Michigan. Morris is a student at NMU and an appointed member of the Board of *The North Wind*.

8.     Defendants, collectively, constitute a quorum of the Board.

## PRELIMINARY STATEMENT

9.     This action is brought pursuant to 42 U.S.C. § 1983 to challenge the constitutionality of the actions of the five Defendants who, as members of *The North Wind*

Board, voted to remove Reed from her duly appointed position as Journalistic Advisor to *The North Wind*, in violation of established Board procedures and as the product of a campaign of intimidation motivated to punish and chill student journalists' investigative news reporting about the University, including reporting critical of NMU.

10.     Plaintiffs seek a declaration that the actions of Defendants violate their constitutional rights and the rights of other student journalists at *The North Wind* as well as injunctive relief against Defendants for the adverse viewpoint and content-based decisions that resulted in violations of the Plaintiffs' First and Fourteenth Amendment rights, as well as costs of this litigation, including reasonable attorneys' fees and costs.

## JURISDICTION

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983.  The Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

12.     Venue is proper in the United States District Court for the Western District of Michigan pursuant to 28 U.S.C. §§ 110 and 1391(b) because the claims arose in the Western District, where NMU is located.

## STATEMENT OF FACTS

13.     *The North Wind* is a newspaper publishing, in print and online, coverage of news and events affecting Northern Michigan University and the surrounding community. *The North Wind*'s offices are located on the NMU campus, and the newspaper is staffed by NMU students.

14.     *The North Wind* is a student-run newspaper. Participation is open to all students at NMU. Students make all content decisions, in consultation with a Journalistic Advisor. The newspaper is funded by student activity fees and advertising.

15.     *The North Wind* is subject to the administrative management and oversight of a Board of Directors, which is governed by a set of Bylaws enacted and periodically updated and revised by the Board.

16.     The Bylaws specify the Board's composition and the method for selecting members. The Board is composed of nine voting members, including the Journalistic Advisor, who – while designated in the Bylaws as an "ex officio" member – is given full voting privileges. The Bylaws reserve one of the nine voting seats for the University's Associate Provost for Student Services and Enrollment or that person's designee. Five seats are designated to be held by students, two of whom are appointed by the Associated Students of NMU, the University's student government association.

17.     Northern Michigan University has delegated its authority to oversee the operations of *The North Wind* to the Board of Directors, authority that devolves from and would otherwise reside with the Board of Trustees and President of the University.

18.     The Bylaws designate *The North Wind* as "an open forum for expression of ideas and opinions(.)"

19.     Most of the members of the Board are not trained or experienced in journalism, nor is such training or experience made a prerequisite for any of the five student seats or the Associate Provost's seat on the Board.

20.     The Bylaws purport to give the Board control over the editorial content of *The North Wind*. Specifically, the Bylaws provide: "The Editor shall be responsible to the

Board for the editorial content and tone of the newspaper and for the selection, direction and supervision of the editorial staff."

21.     Although, as described in more detail *infra*, it is not constitutionally permissible for a government oversight body to dictate the content of a journalistic student publication, Defendants repeatedly have relied on their purported authority over "tone" to overstep their constitutional boundaries. For example, during February 2015, the student government association surveyed the student body about satisfaction with various aspects of campus life, including *The North Wind*. When the responses were provided to Defendant Kall, she circulated them by email to the members of the Board for discussion at the March 13, 2015, Board meeting with the accompanying comment: "We will be using it to discuss the ratio of negative to positive comments about the North Wind and how we can address the tone and content of the paper to change our reputation," indicating a clear intention to use the Board's authority to control the "tone and content" of *The North Wind*.

22.     As the Journalistic Advisor, Reed advises the student editors and reporters of *The North Wind*. This role is intended and designed to allow the student editors to exercise and maintain editorial control over the content of the newspaper. Consistent with long-standing precedent, the Editor in Chief of *The North Wind* has final authority for publication content and content decisions rest in the hands of the student editors.

23.     As advisor, Reed provides guidance and feedback to the student editors and reporters of *The North Wind*, including guidance on developing news and opinion content and specifically including the use of the Michigan Freedom of Information Act to obtain public records for use in formulating journalistic work product. In adherence to the

newspaper's policies, to ethical standards that guide the field of journalism advising and to the First Amendment, Reed does not determine the content of the newspaper.

24. As Journalistic Advisor to *The North Wind*, Reed has been assigned to teach a 2 credit course related to the newspaper entitled "EN 480, Practicum." EN 480 is described by NMU as "[c]losely supervised service for the student newspaper." It is a pass/fail class in which the students are required to write six stories for *The North Wind*, do some copy editing on production nights and meet with Reed to go over their stories. The students also attend the weekly critique of the newspaper and the editorial meetings to decide future stories.

25. Reed receives compensation for her position as Journalistic Advisor in the form of paid "release time" that enables her to earn the full salary for the position of Assistant Professor without carrying the full teaching load that would otherwise be required. *The North Wind* pays a stipend to the University for Reed's "release time."

### *The North Wind publishes articles questioning University practices and experiences retaliation and harassment*

26. Reed joined the faculty of NMU in August 2014 with responsibilities both for teaching and for advising *The North Wind*. Reed is an experienced journalist who served as editorial page editor, columnist, book critic and investigative reporter at the *Chicago Sun-Times* and several other newspapers winning awards that include Harvard University's Goldsmith Prize and the Investigative Reporters and Editors award for investigative reporting. Reed holds an MFA in Creative Writing-Fiction from Northwestern University, a master's degree in journalism from the Ohio State University, and dual bachelor's degrees in newswriting and photojournalism from the University of Missouri.

27. During Reed's term as advisor, *The North Wind* has received accolades for the quality of its students' journalistic work, winning four awards from the Associated Collegiate Press, more than the publication won in any full 12-month period since 2006. During February 2015, the publication took home three "Best of Show" awards at the "Best of the Midwest" college media convention in Minneapolis and an award for outstanding multimedia package at the National College Journalism Convention, for work performed during Reed's time as advisor.

28. During the 2014-15 school year under the direction of student editors including Emma Finkbeiner and Michael Williams and with guidance from Reed, *The North Wind* has used Michigan Freedom of Information Act ("FOIA") requests more frequently and aggressively than in past years to obtain access to documents for use in investigative news stories. On several occasions, Reed personally interceded as an advocate for her students to remind NMU administrators of their obligations under the FOIA law when requests were not answered on a complete or timely basis.

29. On Oct. 3, 2014, a reporter for *The North Wind* filed a request with the University, pursuant to the Michigan FOIA, requesting access to contracts with two vendors, Starbucks and Stone Creek Coffee, relating to coffee concessions on the NMU campus. Under the FOIA statute, compliance with the request was due, with the benefit of a 10-day discretionary extension, no later than Oct. 24, 2014. By email of Oct. 24, 2014, NMU's Vice President for Finance and Administration, Gavin Leach, notified the reporter that, because of a confidentiality clause in the contract, the University's agreement with Starbucks would not be produced unless and until Starbucks agreed to the disclosure. The

contract was produced on Oct. 28, several days beyond the expiration of the statutory deadline.

30.     After an informal request for the documents, but before the October 3 formal FOIA request for the Starbucks contract, Reed was told that the English faculty would have to vote to provide her with the full four credit-hour course release she was offered upon her hiring.  On October 17, 2015, the English department voted to approve the four-hour course release time, but the vote was overturned by the dean and was instead allotting a two credit-hour course release for the Journalistic Advisor position.  Reed then filed a grievance with her union.  Pursuant to a negotiated settlement between Reed's union and the University, Reed continued to have the full four credit-hour course release for the 2014-2015 academic year. She was informed in March, when she received her fall schedule, that the acting department head had reduced the advisor release time back to two credit-hours for the 2015-2016 academic year.

31.     On the front page of its Oct. 30, 2014, edition, *The North Wind* carried a news story headlined, "NMU signed secret Starbucks deal," which described the financial terms of the contract and quoted several attorneys knowledgeable about the law of public records who were critical of the University's stated rationale for delaying production of the document. The article quoted attorneys from the Reporters Committee for Freedom of the Press and the Student Press Law Center opining that, if the contract required Northern Michigan University not to grant the public access to the document, then the contract would violate the Michigan FOIA.

32.     The overall tone of the article was skeptical of the merits of the NMU agreement with Starbucks. The article quoted a student critic of the Starbucks agreement,

who stated that many students were dissatisfied with Starbucks having a "monopoly on campus." The article also contrasted the financial terms of the Starbucks agreement with those of a competing vendor, Stone Creek Coffee, which appeared to cost the University significantly less than what was being paid to Starbucks.

33.      In its next print edition on Nov. 6, 2014, *The North Wind* published a follow-up story about the Starbucks contract on its front page headlined, "University Defends Its Beans," under the byline of a senior member of the staff, current editor-in-chief, Emma Finkbeiner.

34.      The Nov. 6 article contained comments from a University vice president defending the merits of the Starbucks agreement and describing the differences in the nature of the contractual relationships between Starbucks and Stone Creek Coffee so as to explain the higher compensation to Starbucks. The article also quoted several critics of the contract and of the University's initial reluctance to produce a copy of it, including a professor of history at NMU, who was quoted as stating in relation to the confidentiality clause in the Starbucks contract: "Obviously they were trying to hide something or they wouldn't have done this." The article stated that "students and faculty said this week they are not convinced that the contract is in their favor," and quoted several students who questioned the terms and confidentiality of the agreement. One student was quoted as saying: "I don't think that Northern should be keeping these things secret from its students and they shouldn't be entering into these secret agreements, especially when the Starbucks CEO went to school here," referring to Starbucks Chairman and CEO Howard Schultz, an alumnus of the University.

35.     The Board of *The North Wind* held a regularly scheduled meeting on Nov. 7, 2014. During that meeting, Defendant Neiheisel confronted Reed and then Editor-in-Chief Katie Bultman about a story written by Bultman and published on the front page of the newspaper on Oct. 16, 2014, under the headline, "Sexual assault cases high, dropping." The article cited recently released crime statistics made available under the federal Clery Act, which showed that, while NMU reported three consecutive years of declining sexual assaults on campus, the aggregate numbers were, in the words of the article, "relatively high in comparison to other colleges in the state." Neiheisel reproached Reed and Bultman over the tone of the headline and the timing of the article, published during NMU's annual "Family Weekend," when many students' family members visit campus and see the newspaper.

36.     By the next board meeting on December 5, 2014, Bultman had relinquished the editor-in-chief position and the Board selected the sitting news editor, Finkbeiner, as the new editor-in-chief.  Plaintiff Williams was appointed to the second-in-command position of managing editor at the Board's January meeting.

37.     On Nov. 10, within days of writing the story about Starbucks and submitting a FOIA request for the University's Lenovo contracts on Nov. 2, Finkbeiner was called to a meeting with James Cantrill, the head of NMU's Department of Communication and Performance Studies, in which Finkbeiner was enrolled. Cantrill told Finkbeiner that, if she and her staff at *The North Wind* continued writing "aggressive" stories about NMU, the University could withhold the newspaper's funding and Finkbeiner's future career prospects could be harmed. Finkbeiner was upset by these statements, which she took as a

threat from a member of the campus administration, and reported them immediately to Reed.

38.     By email of Nov. 12, 2014, Reed reported what Finkbeiner told her about the confrontation with Cantrill to Neiheisel. Neiheisel wrote back telling Reed to refer Finkbeiner to the University's Title IX office, which handles complaints of harassment. Several weeks later, the college's Title IX coordinator notified Finkbeiner that the case was being closed with no action against Cantrill and no finding that any harassment took place.

39.     The following day, *The North Wind* published another prominent article portraying the University in a critical light. The first-person article by *North Wind* staff member Heather McDaniel gave an account of her sexual assault at the hands of a male student who lived in her dorm, and how she felt violated by the University's disciplinary process when, during a campus judicial board's hearing on her sexual assault complaint, she was interrogated about her drinking habits and photos from her personal Facebook page were displayed.

### *Vice President Neiheisel and the Board interfere with The North Wind's ability to gather information about university retaliation*

40.     After the conversation with Cantrill, Finkbeiner was fearful that NMU administrators were planning to remove the newspaper's funding or harm her career. To find out what was behind Cantrill's threat, Finkbeiner submitted a FOIA request on Dec. 7, 2014, to Gavin Leach, NMU Vice President for Finance and Administration, who is the administrator designated by NMU to process FOIA requests. In the request, Finkbeiner asked for correspondence about herself, Reed, Bultman or *The North Wind* during the period from Sept. 30 to Dec. 7, 2014, among eight specified NMU officials, including Cantrill, Defendant Neiheisel and President Erickson.

41. The University responded with a bill for $613 to gather and produce the requested documents, which was reduced to $300 through negotiation after Finkbeiner agreed to narrow the scope of the request. During the negotiations, Reed stated that she would try to raise the money independently through an online donation campaign and alumni. Neiheisel forbade her from doing so and said the Board would forbid her from doing so. Half of that, $150, was due in advance for the University to begin processing the request.

42. When Finkbeiner presented the $300 invoice to the Board at its regular meeting on Jan. 16, 2015, the Board voted to deny it, with four of the Defendants voting against the expenditure and one (Gaidelis) absent. Neiheisel voted against the expenditure despite his personal stake in the outcome, without disclosing the existence of the conflict.

43. The Board's questioning and debate over the expenditure intruded into Finkbeiner's and Williams' discretionary news judgments as *The North Wind*'s editors. Several Board members openly questioned the journalistic merits of the FOIA and said they were voting against the expenditure because they were unconvinced that the FOIA was journalistically necessary and they questioned the validity of the news story.

44. Unbeknownst to Finkbeiner, Reed or the newspaper's staff at the time, Neiheisel's assistant had emailed each of the five student Board members during the week of Jan. 11, 2015, asking each to meet one-on-one with Neiheisel about Board business. According to one of the five students who participated in the closed-door meetings, Mary Malaske, Neiheisel used the meeting to inveigh against *The North Wind*'s practice of making FOIA requests that the University considered unnecessary and wasteful. At no time during that meeting, according to Malaske, did Neiheisel disclose that his own emails were

12

the subject of the latest request that he was instructing the Board members to help him obstruct. Neiheisel used the meeting to criticize Reed's focus on investigative journalism, saying it was the Board's job to control the "tone" of the publication and that the newspaper was portraying the University in a negative light, specifically mentioning the inquiry into the Starbucks contract, according to Malaske.

45.     The Jan. 16 meeting marked a shift in the relationship between Reed and the Board, which – before Neiheisel's one-on-one meetings with the student members – had been cordial and professional.

46.     The Board's decision to obstruct the newspaper's FOIA request became the subject of adverse national media attention for the University. The Society of Professional Journalists, the nation's largest organization of news media professionals, criticized the decision and offered to pay the $150 down payment on the newspaper's behalf.

47.     Responding to the outpouring of negative publicity, President Erickson instructed Leach to fulfill Finkbeiner's request without charge.

48.     On Jan. 24, 2015, NMU produced approximately 200 pages of emails sent or received by the eight officials identified in the FOIA, and another approximately 1,000 pages on Jan. 26, 2015. Several dozen pages of the emails were redacted in whole or in part. Along with the production, Leach sent a letter asserting a number of exemptions to the FOIA statute that purported to entitle the University to withhold documents in their entirety or to redact material portions of them.

49.     As provided for by Michigan law and by the policies of the University, Finkbeiner filed an appeal with Erickson on Jan. 29, 2015, disputing the decision to redact

or withhold emails, and questioning the applicability of the FOIA exemptions on which the University relied in making the decisions to redact or withhold.

50.     President Erickson denied the appeal and stood by the January productions as representing all of the documents to which Finkbeiner was entitled.

51.     On Feb. 11, 2015, Michigan Press Association attorney Robin Luce-Hermann, wrote to President Erickson on behalf of *The North Wind* asking him to take immediate steps to remedy what the letter identified as "a pattern of antagonism toward the newspaper, its staff and faculty advisor connected with *The North Wind*'s pursuit of news stories about the University's contracting practices." The letter was co-signed by attorney Frank D. LoMonte, executive director of the Student Press Law Center in Washington, D.C., a nonprofit legal-services organization.

52.     The letter described a series of adverse actions taken against Reed and the newspaper staff, including the threats conveyed by Cantrill.  The letter also described how the Provost and Dean of Arts and Sciences went against the Department of English's agreement to provide Reed with four credit-hours of paid "release time" for time spent advising *The North Wind*, which she had been promised upon her hiring by Department Head Ray Ventre.

53.     The letter included multiple citations to legal precedent establishing that the officials of a public university may not penalize or retaliate against student journalists for the content or viewpoint expressed in journalistic publications, even when those publications are financially supported by the institution and advised by an employee of the institution.

54.     In the letter, Luce-Hermann specifically cautioned Erickson that the Bylaws were improper to the extent that they purported to give the Board control over the "tone" of the newspaper, interjecting government officials into the editorial decision-making process.

55.     The letter further explained that NMU was improperly citing exemptions to the Michigan FOIA statute in withholding more documents from Finkbeiner than allowed by law.

56.     The letter requested that Erickson take curative measures to reaffirm the University's support for freedom of the press and to clear the air about Cantrill's remarks, including directing that the University respond completely to Finkbeiner's December FOIA request, revising the newspaper's Bylaws to make clear that the Board has no control over the "tone" of the publication or which documents the staff requests through FOIA, and restoring the compensated release time that Reed was promised.

57.     In response to Luce-Hermann's letter, Erickson wrote to the staff and advisor of *The North Wind* on March 10, 2015, declining to provide any relief on any of the concerns raised in the letter. Specifically, he declined to waive reliance on any of the discretionary FOIA exemptions on which NMU relied in withholding or redacting public records requested in December 2014, declined to ask or instruct members of the Board of *The North Wind* to adopt legally compliant bylaws recognizing their inability to control the content or tone of the newspaper, and declined to direct the English department to honor its agreement with Reed to provide adequate release time to compensate for the demands of performing the Journalistic Advisor job. Erickson refused to acknowledge any wrongdoing by anyone at the University toward *The North Wind*, and instead, used the

letter to attack the accuracy of the newspaper. Erickson did not disavow Cantrill's threatening remarks or give any reassurances to negate the effect of Cantrill's threat that continued aggressive news coverage would place the newspaper's funding and the students' career opportunities in jeopardy.

### *Hostility against The North Wind escalates following publication of news about trustee expenses and the April fool's edition of the newspaper*

58.    On March 19, 2015, *The North Wind* published a front-page article headlined, "The 'suite' life of NMU Board of Trustees," describing the expenses for which members of the Board of Trustees of NMU had billed the University and received reimbursement. The article was the product of a FOIA request filed with Leach's office on Feb. 10, 2015. The article provided examples of air and hotel costs charged to NMU by Board members, pointing out that the Board had expended $30,000 on transportation during the preceding 13 months and that one particular member had received $11,000 in travel reimbursements during the preceding year.

59.    The article provoked an angry response from the chair of the Board of Trustees, Rick Popp, who circulated a campus-wide email on March 25, 2015, to holders of Northern Michigan University email accounts (students, faculty and staff) denouncing *The North Wind*'s reporting.  Popp's email said in part: "I am disappointed with the North Wind's apparent effort to discredit and disrespect some of NMU's most ardent supporters. I'm further disturbed that this public action is continuing a recent pattern, and the disrespect for some of our most successful and generous alumni and advocates appears to be an attempt to demonstrate that the North Wind was digging deeply into a legitimate news story – which is clearly not the case." The email criticized the newspaper for "scurrilous and sensationalized suggestions" about the legitimacy of board members' travel expenses.

60. On April 2, 2015, The North Wind published its annual April Fool's edition, entitled *The Southern Blow*. As might be expected, this satirical and parodic edition of the newspaper poked fun at the NMU administration, trustees, the Board, and the paper's editors themselves, among others, specifically including humor mocking the Starbucks contract and the University's aggressive use of FOIA record redactions.

### Board violates protocol in removing Reed as advisor

61. Despite Board policies which call for a fall evaluation of the Journalistic Advisor to be sent out in November, the Board sent out Reed's Board and Staff evaluations on Jan. 17, 2015, the day after the Board voted to deny funding for the FOIA documents. The process included evaluations both by the staff of *The North Wind* and by members of the Board. Reed received excellent evaluations from the staff of the newspaper and mixed evaluations from members of the Board, several of whom criticized her for a lack of "cooperation" with the Board.

62. The Board presented Reed with the results of the evaluation process at a meeting on March 12, 2015. At no time during that discussion, or at any time afterward until the Board's meeting of April 3, 2015, was Reed told that her scores on the evaluation placed her job in jeopardy or that the Board was considering not retaining her as advisor. In fact, Reed asked Neiheisel what would happen if her Board evaluations did not improve and Neiheisel responded that was up to the English Department.

63. Reed's evaluation from the English Department was exceptional. The English Department Executive Committee commended Reed for her "commitment to journalistic excellence in both her courses and her advising of the university newspaper." The report also noted Student evaluations of Professor Reed's advising of *The North Wind*

were excellent, with one hundred percent of all eleven (11) students who responded marking strongly agree/agree to comments about her preparedness, her interest in the subject, her helpful comments and evaluations of their work, and her teaching of real-world applications for journalism ethics." The committee also said it was "delighted" by Reed's performance in "all areas" of her work.

64.     The Board held a regularly scheduled meeting on April 3, 2015, for which the published agenda included an item titled "2015-2016 Appointments." The agenda did not specify which positions were to be discussed, and Reed was not told that her status as advisor was to be reviewed.

65.     Notwithstanding the lack of notice, during the April 3 meeting, Chairman Kall called for an executive session and instructed the non-Board members in attendance – including Finkbeiner– to leave the room so the Board could discuss a personnel issue. Defendant Williams was only permitted to stay in the executive session for his interview for the Editor-in-Chief position, but was otherwise not permitted in the closed meeting.

66.     During the executive session, Defendants made numerous statements indicating an intent to remove Reed as an advisor because of their displeasure with the content and viewpoints published by students *The North Wind*. For example, Defendant Morris stated that Reed was not doing her job because she should be "editing" the newspaper, although it was pointed out that such involvement by an employee of the university would overstep the boundaries of the First Amendment.  Defendant Lakosen stated that the previous year the Board did not have problems with *The North Wind* and the only aspect that was different was that Reed was the advisor.

18

67.     The five Defendants voted to remove Reed.  No other member of the Board voted for her removal.

68.     All five Defendants also voted against Williams' candidacy for the Editor-in-Chief position.  No other members of the Board voted against Williams' candidacy.

69.     Defendants' true motives in replacing Reed are underscored by the fact that the Board deviated substantially and without justification from typical procedures. The Bylaws provide a process by which an advisor is selected annually upon submission of a name by the English Department and with the concurrence of both the Board and the editorial staff of *The North Wind*. The Bylaws do not provide any authority for the Board to initiate removal of an advisor.

70.     The Board not only failed to solicit the approval of the editorial staff of *The North Wind* before removing Reed, but required the members of the editorial staff who were in attendance at the Board meeting to leave the room while Reed's position was discussed.

71.     The decision to not renew Reed as advisor at the second-to-last regularly scheduled Board meeting of the term – with no other candidate for the position identified, and without conferring either with the English department or with the newspaper's editorial staff –conveyed a message from the Board to Williams and *The North Wind*'s staff that the newspaper's "tone" toward the University was unacceptable.

72.     The Board further deviated from standard procedure in the vote on Reed's non-renewal by voting, immediately prior to discussion of Reed's position, to amend the Bylaws so that parties with an interest in a vote would be disqualified from participating.

The Board invoked this hurry-up Bylaws amendment specifically to prevent Reed from voting on her own removal.

73. The conflict-of-interest amendment was a part of the larger package of Bylaws reforms proposed by an ad-hoc Board committee that Reed chaired. However, the Board has acted on none of the other proposed Bylaws amendments, including the recommendation to remove references in the Bylaws to the Board's authority over the editorial content and tone of the newspaper.

74. The Board's message to the newspaper that its "tone" toward the University was unacceptable was underscored when the Board voted at the same meeting to reject Williams' candidacy for the position of editor-in-chief and to re-advertise the position in outlets other than *The North Wind* with the express intent of recruiting an editor unconnected with the newspaper.

75. It has been the established practice at *The North Wind*, in keeping with standard operating procedure at college student newspapers nationally, to select an editor from among experienced members of the newspaper staff. For the Board to deviate from that practice concurrently with the decision to remove Reed as advisor sent a message of intimidation and retaliation to Williams and the other journalists of *The North Wind* that the Board views expressing viewpoints critical of the University to be a punishable offense.

76. On April 8, 2015, Finkbeiner and other staff members from *The North Wind* met with President Erickson to discuss the events of the April 3 Board meeting. At the meeting, the students asked whether President Erickson would intercede and overrule the determination of the Board regarding Reed's removal given the questions raised about the

propriety of the vote. Erickson told the students that he regarded the vote of the Board to be final and that he would not overturn it.

77.     Because of their reliance on Reed's guidance and as a trusted mentor, Williams and the staff of *The North Wind* have been intimidated by Reed's removal.

78.     Because of Defendants' actions in removing Reed as Journalistic Advisor for the newspaper, Reed has had her teaching load increased with the loss of her course release and her future courses altered. Rather than teach the Practicum, EN 480, Reed has been reassigned to teach a different course.

79.     Williams has re-applied for the Editor-in-Chief position with *The North Wind*. The Board will be conducting interviews at a meeting on April 17, 2015.

80.     Even if denied appointment as Editor-in-Chief, Williams intends to remain active on the staff of *The North Wind* and to contribute articles about newsworthy matters of public concern. However, Williams will be more hesitant to pursue journalistic articles reflecting unfavorably on the University as a result of Reed's removal, knowing that the Board believes itself to have control over the "tone" of newspaper content and to have punitive authority over those who express viewpoints critical of the University. Williams will be less likely to pursue requests for public records without Reed to provide the knowledge and support that emboldened the newspaper staff to assert their rights under the Michigan FOIA.

81.     Moreover, if the Board hires a new Editor-in-Chief, especially one that agrees with Defendants' viewpoint on the role of *The North Wind*, Williams could be fired from his current position as managing editor, or from the newspaper entirely. The Editor-in-Chief is responsible for the staffing of the newspaper's staff.

82.     The actions of Defendants will deprive Williams and the staff of *The North Wind* of the benefit of Reed as their advisor, someone who is both eminently qualified and willing and eager to serve in the position.

83.     The climate of fear and intimidation created by Reed's removal and by the actions of the Board amounts to a restraint on the free speech of students writing for *The North Wind* and on Reed herself.

## COUNT I – 42 U.S.C. § 1983

### (*Freedom of Speech/Freedom of Press*)

84.     Plaintiffs incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

85.     Plaintiffs have constitutional rights under the First and Fourteenth Amendments to the United States Constitution to the exercise of the freedom of speech and press, free from interference by state actors.

86.     By removing Reed from the Journalistic Advisor position, Defendants have acted under color of state law.

87.     In contravention of these constitutionally protected rights, Defendants directly violated Plaintiffs' constitutional rights, encouraged violations of Plaintiffs' constitutional rights, and/or acted with deliberate indifference to those rights by their removal of Reed from the position of Journalism Advisor as part of a policy and pattern of conduct to suppress the expression of viewpoints critical of the University.

88.     This pattern of harassing and intimidating conduct also included actions of the Defendants in (1) obstructing *The North Wind*'s ability to obtain public records needed to investigate the University's treatment of the newspaper and its staff, (2) refusing even

to consider the recommendations of the Bylaws working committee that would reform the Bylaws to recognize limitations on the Board's ability to control editorial content, and (3) voting to deny Williams the position of editor-in-chief for which he was amply qualified and for which he was the only applicant.

89.     In contravention of these constitutionally protected rights, the Defendants have attempted to censor *The North Wind* and Plaintiffs by intimidation and retaliatory action aimed at silencing Plaintiffs sometimes critical view of NMU.

90.     Defendants' adverse actions were under color of state law and were impermissibly based, in significant part, on the content of the newspaper and the viewpoints of Williams and other speakers and resulted in a chilling of the First Amendment rights of the Plaintiffs.

91.     There was no legitimate reason for the Defendants' actions, and any attempt by the Defendants to label their actions as such is mere pretext to mask the adverse viewpoint and content-based reasons for their actions.

92.     As a direct and proximate cause of Defendants' actions, Plaintiffs were injured in their rights to free speech and free press guaranteed by the First and Fourteenth Amendments of the United States Constitution.

93.     Plaintiffs' rights, status and legal relations are affected by the actions of the Defendants under color of state law, and Plaintiffs hereby seeks judicial determination and declaration of the First Amendment rights of themselves, *The North Wind* and its student editors to exercise editorial decisions, even if these decisions are contrary to the wishes of Defendants, the Board, and/or the administration of NMU.

94.     Plaintiffs have been irreparable injured and have no adequate remedy at law.

## COUNT II – 42 U.S.C. § 1983

### *(Retaliation)*

95.     Plaintiffs incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

96.     *The North Wind*'s publication of articles critical of certain individuals and organizations on the NMU campus is a constitutionally protected activity.

97.     Defendants retaliated against Plaintiff Reed, as well as Plaintiff Williams and other student journalists by removing Reed from the position of Journalistic Advisor as part of a pattern of conduct to suppress the expression of content and viewpoints critical of the University.

98.     This pattern of harassing and intimidating conduct included actions of the Defendants in (1) obstructing *The North Wind*'s ability to obtain public records needed to investigate the University's treatment of the newspaper and its staff, (2) refusing even to consider the recommendations of the Bylaws working committee that would reform the Bylaws to recognize limitations on the Board's ability to control editorial content, and (3) voting to deny Williams the position of editor-in-chief for which he was amply qualified and for which he was the only applicant.

99.     *The North Wind*'s outspoken and sometime critical articles were the cause of the retaliation brought on by the Defendants.

100.     Plaintiffs have been irreparably injured and have no adequate remedy at law.

WHEREFORE, Plaintiffs seek judgment against Defendants for the following relief:

(a)    Entry of an Order granting temporary relief to Plaintiffs in the form of a Preliminary Injunction retaining Reed in the Journalistic Advisor position;

(d)    Entry of an Order enjoining Defendants, and those acting at the direction of, or behalf of, the Defendants, from considering the viewpoints expressed in *The North Wind* as a basis for decisions affecting the structure, governance and functioning of the newspaper, including the selection and retention of the Journalistic Advisor and editors;

(e)    Entry of an Order enjoining Defendants, and those acting at the direction of, or behalf of, the Defendants, from using their authority to retaliate in any way for Plaintiffs' assertion of the constitutionally protected rights;

(f)    An award of Plaintiff's costs of litigation, including reasonable attorneys' fees and expenses pursuant to 42 U.S.C. § 1988; and

(g)    An award of such other relief as this Court deems just and equitable

Dated: April 16, 2015                    Respectfully submitted,


                                         By: /s Paul R. McAdoo
                                         Paul R. McAdoo (P77463)
                                         McAdoo Law PLLC
                                         204 N. Wallace Blvd.
                                         Ypsilanti, MI 48197
                                         (734) 340-9496
                                         paul@mcadoolaw.com

                                         Attorney for Plaintiffs