UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHERYL REED and MICHAEL WILLIAMS

                  Plaintiff,             Case No. 2:15-cv-57

v.                                   HON. R. ALLAN EDGAR

STEVEN NEIHEISEL et al

                  Defendant.

_____/

## MEMORANDUM OPINION

      This case is before the Court on plaintiffs' request for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure.  The plaintiffs are Michael Williams ("Williams"), Managing Editor of the North Wind, a student newspaper at Northern Michigan University ("NMU" or "The University"); and Cheryl Reed ("Reed"), the faculty Journalistic Advisor to that publication.  They bring their case pursuant to 42 U.S.C. § 1983 against four students who served on the newspaper's Board of Directors (the "Board"), and Steven Neiheisel, who is employed by NMU as Vice President for Enrollment Management and Student Services.  Mr. Neiheisel also serves as a member of the Board.  Plaintiffs' claim is that these defendants have engaged in a pattern of conduct designed to chill plaintiffs' First Amendment rights; and have retaliated against them for the exercise of their First Amendment rights.  Plaintiffs ask the Court to enter a preliminary injunction "retaining Reed in the Journalistic Advisor Position".  This memorandum is the Court's resolution of the preliminary injunction request.  Plaintiffs also ask the Court to enter an order enjoining defendants "from considering the

viewpoints expressed in The North Wind as a basis for decisions affecting the structure, governance and functioning of the newspaper, including the selection and retention of the Journalistic Advisor and editors"; and enjoining defendants "from using their authority to retaliate in any way for plaintiffs' assertion of constitutionally protected rights."  Plaintiffs do not seek to recover damages, but do request costs, attorney's fees and expenses.

I.

The North Wind is governed by a Board of Directors.  The purpose of the Board, according to its by-laws, is to "publish and distribute a weekly newspaper which provides an open forum for expression of ideas and opinions and contains news of interest to students of Northern Michigan University."  At this juncture, it is not clear how the Board came into existence.  The Board is responsible for the general management of the paper.  It appoints the Editor and Business Manager.  The Editor is responsible to the Board for "the editorial content and tone of the newspaper."  While the editor has the authority "to establish editorial policy, he/she shall, nonetheless, be responsible for providing a balanced presentation of news and opinions, striving constantly for completeness, timeliness, accuracy and objectivity."  The by-laws provide for a "Journalistic Advisor" (Plaintiff Reed in this case) "to provide advice in matters pertaining to journalistic style, quality, accuracy, content, objectivity, ethics, etc."  The Journalistic Advisor does not determine the content of the newspaper.  Students make all content decisions.

The nine member Board consists of five students (three appointed by the Board

2

itself and two designated by student government subject to Board approval).  Other Board members are a member of the faculty selected by the Board; one person from professional news media who is not employed by NMU, but is appointed by NMU's president; NMU's Assistant Provost for Student Services and Enrollment or his or her designee (Defendant Neiheisel in this case); and a the Journalistic Advisor.  The Journalistic Advisor is selected annually by the English faculty and department head from faculty members, with their choice being subject to the approval of the Board as well as the editorial staff.  As the Provost's designee, Neiheisel also acts as Financial Advisor.

Student Board members receive neither monetary compensation nor academic credit for their service.  Only the Board itself has the exclusive power to remove any director.  It only may do so by a two-thirds vote.  However, the removal of the Associate Provost for Student Services and Enrollment, (or his designee) as well as the news media representative, requires the approval of NMU's President.  The North Wind is funded through the sale of advertising and a dedicated portion of a student activity fee.  Amendments to the by-laws can be made by a two-thirds vote of the Board, but must be approved by student government and the NMU President.

In October and November of 2014, the North Wind published news stories critical of a contract entered into between Starbucks and NMU.  The author was someone at the North Wind, who is not a participant in this litigation. The editorial staff submitted several requests to NMU under Michigan's Freedom of Information Act (FOIA) to obtain information.  The University wanted $300 for expenses incurred in connection with an FOIA request.  The Board (including the defendant students) voted

3

to deny the request. The reasons for this vote are in dispute. However, the University later waived the fee. In October 2014, the North Wind published a controversial story about sexual assault on campus. It is evident that Plaintiff Williams was not associated with the North Wind when these articles were published. In March 2015, the North Wind published a piece critical of the travel expenses incurred by members of the University Board of Trustees. This generated a University-wide e-mail from the chair of the University's Board of Trustees critical of the North Wind article.

On April 3, 2015, the Board decided by a 5-4 vote to not approve Reed as the Journalistic Advisor, for the next school year, even though she had been selected by the English Department. The reasons for this action are hotly contested. The English Department later selected someone else, which the Board approved, but not the Editorial staff. So as of now, the Board is without a Journalistic Advisor for the 2015-16 school year. Reed remains as a member of NMU's faculty. Williams applied to the Board for the Editor position, but after his interview, he was not selected. The reasons for this non-selection are very much in dispute. He remains as Managing Editor.


II

When considering a motion for a preliminary injunction, this Court must consider four factors: (1) the plaintiffs' likelihood of success on the merits; (2) whether the plaintiffs may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest. *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001).

4

A.     Likelihood of Winning on the Merits

1.     State Action

Because plaintiffs are suing defendants under 42 U.S.C. § 1983 for violation of their First Amendment rights, they must demonstrate that (1) there was a constitutional violation and (2) the violation was committed by a state actor. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Mezibov v Allen,* 411 F.3d 712, 716 (6th Cir 2005).

The Court turns first to the second of these requirements - whether the defendants were state actors. The defendants in this case are four student Board members who voted not to approve Reed as Journalistic Advisor. The fifth vote was supplied by Mr. Neiheisel. As an employee of NMU, a public state university, he is unquestionably a state actor. However, whether the four student defendants are state actors presents an entirely different question. Private individuals may only be treated as state actors if their actions are fairly attributed to the state. *Lugar v. Edmondson Oil, Co.*, 457 U.S. 922, 937 (1982); *Street v Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Although private actions may deprive an individual of a Constitutional right, they are subject to liability under § 1983 only when done under color of state law because rights secured by the Constitution are protected only against infringement by governments. *Flagg Bros., Inc. v Brooks*, 436 U.S. 149, 156 (1978). The student defendants are indeed private individuals.

Courts have devised various "tests" to determine whether particular conduct is state action. The first of these tests is the "Public Function Test." To show a person has acted under the color of state law pursuant to the Public Function Test, a plaintiff must show that the private entity exercised powers that are traditionally and exclusively

5

reserved to the state, such as holding elections or eminent domain. *Flagg Bros., Inc*.,
436 U.S. at 157; *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). The Public
Function Test is interpreted narrowly and is rarely applied. *Carl v Muskegon Cnty.,* 763
F.3d 592, 595 (6th Cir. 2014); *Chapman v Higbee Co.,* 319 F.3d 825, 833 (6th Cir.
2003). Only such functions like holding elections, operating a company-owned town,
and eminent domain issues have been considered categories of state action under the
test. *Chapman* 319 F.3d at 833-34. Under the Public Function Test, a historical
analysis is used to determine whether the private action complained of is an action
traditionally exclusively reserved to the state, and the plaintiffs bear the burden of
advancing historical and factual allegations to support this assertion. *Marie v American
Red Cross*, 771 F.3d at 344, 362 (6th Cir. 2014); *Wittstock v Mark A. Van Sile, Inc.*, 330
F.3d 899, 902 (6th Cir. 2003).

Contrary to the plaintiffs' assertion, the non-approval of Reed as Journalistic
Advisor was not the exercise of a power exclusively reserved to the state. The same
can be said about Williams' non-selection as Editor. All sorts of entities, public and
private, make personnel decisions. Moreover, it certainly cannot be said that publishing
a weekly newspaper is a power reserved exclusively to state government. It is
noteworthy that the defendants' acts had no impact on Reed's employment by the
University. Defendant students are not state actors by virtue of the "public function"
test.

A second state action test is the "Symbiotic Relationship or Nexus Test." Here,
there would only be state action if there is shown to be a sufficiently close nexus

6

between the state (NMU) and the challenged action of the student defendants. *Wilcher v City of Akron*, 458 F.3d at 516, 520 (6th Cir. 2007), *Wolotsky*, 960 F.2d at 1335. This test is applied in situations where there is an entity that is to some extent regulated by the state, like a cable operator, (*Wilcher, supra*). Community mental health centers (*Wolotsky, supra*); "Memphis in May" festival (*Lansing v City of Memphis*, 202 F.3d 821 (6th 2000)). In this case, it does not appear that NMU regulates these students, or the Board on which they serve. The Board is essentially an independent entity controlled by students who are not selected or removable by NMU. Even if these defendants were extensively regulated, this would not justify a state action finding. The Board (not the students) does receive a portion of a student activity fee. However, public funding is not enough to satisfy this test. *Lansing*, 202 F.3d at 830. Finally, the minority presence of Mr. Neiheisel on the Board does not convert the Board (nor the students) into state actors. *Id.* at 831. Whatever connections exist between NMU and the Board fall far short of making either the Board or the defendant students state actors under this test. See *Husain v. Springer*, 494 F.3d 108, 135 (2d Cir. 2007)

The "entwinement test" is a third state action test. In order to demonstrate state action under the entwinement test, plaintiffs must show that the defendants were entwined with governmental policies or that the government is entwined in the private entity's management or control. *Brentwood Acad. v Tenn Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001); *Marie*, 771 F.3d at 363; *Hughes v Region VII Area Agency on Aging*, 642 F.3d 169.178 (6th Cir. 2008). "The crucial inquiry under the entwinement test is whether the 'nominally private character' of the private entity is

7

overborne by the pervasive entwinement of public institutions and public officials in its composition and workings [such that] there is no substantial reason to claim unfairness in applying constitutional standards to it." *Marie*, 771 F.3d at 364.

There are some small tentacles connecting the Board and NMU, as related above. However, clearly the Board is not entwined with NMU. The by-laws make this very clear. The seminal case giving rise to the "entwinement" test is *Brentwood Acad.*, 531 U.S. 288 (2001), where state action was found on the part of a state athletic association which was comprised mostly of state school officials. Mr. Neiheisel's presence as one member of a nine-member board does not amount to entwinement.

Finally, the fourth state action test is the "State Compulsion" Test. Under the State Compulsion Test, the actor(s) must "exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Wolotsky*, 960 F.2d at 1335 (citing *Blum v Yaretsky*, 457 U.S. 991, 1004 (1982)). "More than mere approval or acquiescence of the private party is necessary to hold the state responsible . . ." *Id*. at 1335 (citing *Blum*, 457 U.S. at 1004). While funding and personnel choices have been deemed ways in which coercion may take place, these are not the only factors to consider. *See id*. at 1336. There is a factual dispute about whether, and if so, to what extent, defendant Neiheisel prevailed upon the four student defendants to disapprove Reed as Journalistic Advisor. However, plaintiffs have not asserted that Neiheisel in any way compelled the defendant students to vote to oust Reed. The most plaintiffs have said is that Neiheisel "influenced" the students. Even if the students were so

8

influenced by a state actor, this would not be sufficient to establish state action. *See e.g., Lansing,* 202 F.3d at 829 (noting that offering to assist or a request to consider did not amount to "significant encouragement" under the state compulsion test); *Wolotsky*, 960 F.2d at 1335 (noting that more than mere approval is needed to constitute state compulsion). If he did somehow put pressure on these students to remove Reed, he could conceivably have been engaged in actionable state action. It's difficult to imagine, however, how much pressure could be imposed on non-compensated student Board members who could not even be removed from the Board except by a super majority vote.

In summary, the Court cannot say that it is more likely than not that plaintiffs will succeed in establishing that the defendants (with the exception of Neiheisel) were state actors.

### 2. First Amendment

Even if plaintiffs have shown that defendants engaged in state action, the Court is unable to conclude that they have demonstrated that a First Amendment Constitutional violation occurred. The heart of their claim is that defendants retaliated against Reed and Williams by "removing Reed from the position of Journalistic Advisor as a part of a pattern of conduct to suppress the expression of content and viewpoints critical of the University." To succeed on this retaliation claim, plaintiffs must show

> (1) that plaintiff was engaged in a constitutionally protected activity; (2) that the defendants' adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiffs' constitutional rights.

9

*Leary v* <u>*Daeschner*</u>, 228 F.3d 729, 737 (6th Cir. 2000) (citing <u>*Bloch v* <u>Ribar</u></u>, 156 F.3d 673, 678 (6th Cir. 1998). If a plaintiff makes this showing, the burden shifts to defendants to show that they would have taken the same action even in the absence of the First Amendment protected conduct. *Id.*

(1) <u>First Amendment Protected Activity</u>. The allegation here is that Reed was not approved as Journalistic Advisor to punish her and her students, including Williams, for the content of the North Wind and to deter Williams and his editorial staff from engaging in investigative journalism unflattering to the University in the future." The problem with this assertion is that plaintiffs have failed to demonstrate that they engaged in any protected conduct. It appears that Williams was not even affiliated with the paper in the Fall of 2014 when the Starbucks and sexual assault articles were published. When asked during oral argument what articles Williams had written, the Court learned that he did not have so much as a byline for anything published critical of the University. It is not at all clear that Williams, as a late arriving Managing Editor, ever engaged in protected speech.

As to Reed, there is substantial question whether she ever engaged in protected speech. There is no allegation that she ever said or wrote anything in the North Wind that was protected speech. In fact, in her role as advisor, she has no control over the paper's content. She only advises the paper's editors; and at this point, there is nothing in the record to reveal what advice, if any, she may have given them. Nor is there any indication that the editors took whatever advice was offered. Plaintiffs rely on *Coppola v. Larson*, 2006 WL 2129471 (2006), a U.S. District Court case, unreported in F.Supp., from New Jersey which does summarily conclude that removal of an advisor to a

10

student newspaper can be a "particularized actual injury" to the paper's editors.  Id. at *8  The Court finds this case unpersuasive here, where other than Williams' bare assertion, there is no indication that Williams' First Amendment rights will suffer from Reed's absence.  Moreover, there is no indication that another faculty member would not be able to adequately fulfill the advisor function.  In fact, Williams says in an affidavit that "[he] intend[s] to remain active as a student journalist during the 2015-2016 school term and to submit articles for publication , , , as I have in the past."  It should also be noted that the advisor in *Coppola* was terminated after 35 years of service; received a salary for the advisor job; and was terminated directly by the institution's administration, not a student-led board.

The only other "student advisor" case cited by plaintiffs is *Moore v. Watson*, 838 F. Supp. 2d 735, (N.D. Ill. 2012).  The court in *Moore* relied heavily on an Illinois statute (The College Campus Act, 110 ILCS 13/1) in concluding under the facts of that case that student editors and a faculty advisor engaged in protected activity in connection with a school paper.  Plaintiffs have pointed to no similar Michigan statute.  In *Moore*, the court found that the university itself engaged in all sorts of egregious speech inhibiting conduct directed at the Student Advisor (including direct termination) as well as the newspaper.  Noteworthy again, is that the advisor's termination was done by the University's President, not a student-led Board.  *Moore* is not analogous to this case.

Finally, Plaintiffs' cite *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001) for the proposition that Reed's First Amendment rights were infringed even though she may have never said anything.  Here an elementary school English

11

teacher was terminated after she selected a speaker to come to her class to talk about hemp, from which marijuana can be derived.  She was terminated by the school superintendent.  The Sixth Circuit upheld her First Amendment retaliation claim even though she was not the speaker.  However, it was quite clear that the hemp message was something that the teacher wanted to convey, albeit through a third party.  Here it is not at all clear that Reed intended to convey any message of public concern regarding NMU.  In fact, it was not her job to do so.  She had no control over editorial content of the North Wind.

To the extent that Reed may be claiming that she engaged in protected activity in the course of her job duties by sending emails and complaining to the University about FOIA requests, this would not be protected activity.  "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communication from employer discipline".  *Garcetti v Ceballos*, 547 U.S. 410, 421, (2006).

In short, it is by no means likely that plaintiffs will be able to show that Reed was engaged in protected activity.[1]

_____

[1] Plaintiffs do not seek damages.  However, it is worth noting that assuming for the moment that Reed was terminated by state actors for engaging in protected activity, they would likely be entitled to qualified immunity for any damages (though not injunctive relief).  Qualified immunity shields a state actor from suit unless that actor violated clearly established federal law.  *Lane v Franks*, 134 S.Ct. 2369, 2381 (2014).  The right must be "sufficiently clear" so that every "reasonable official would have understood that what he is doing violates that right."  *Ashcroft v Al-Kidd*, 131 S. Ct. 2074, 2083 (2011)  Reed's claim that she was engaged in protected activity when she advised the students is not clearly established by federal law.  Nor is Williams' claim that his rights were violated when Reed was terminated.  The right must be clearly established, and two decisions from District Courts outside this jurisdiction are not enough to satisfy the first prong of qualified immunity.  *Wilson v Layne*, 526 U.S. 603, 617 (1999).

Another problem for Reed is that she likely lacks standing to bring a section 1983 claim on behalf of Williams or the other student editors by alleging that their speech was chilled when she was not renewed as student advisor.  Section 1983 creates a cause of action for deprivation of civil rights "to the party injured" by the alleged constitutional violation. *Barber v Overton*, 496 F.3d 449, 457 (6th Cir. 2007); *Claybrook v Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000); *Jaco v Bloechle*, 739 F.2d 239, 241 (6th Cir. 1984).  Section 1983 is "entirely personal to the direct victim of the alleged constitutional tort" and only applicable to the purported victim or that victim's estate. *Barber*, 496 F.3d at 457; *Claybrook*, 199 F.3d at 357.  Reed does not claim to be the direct victim of the alleged chilled speech and she certainly does not represent any victim's estate.

One wrinkle in the standing issue involves third-party retaliation claims in Title VII actions.  Courts have found that a third-party employee can maintain retaliation claim against an employer if the third-party employee was fired in order to retaliate against that third-party employee's close family member for engaging in a protected activity. *Thompson v North American Stainless, LP*, 562 U.S. 170, 174 (2011); *Benison v Ross*, 765 F.3d 649, 657–58 (6th Cir. 2014).  In *Thompson*, the Court found that Thompson could maintain his retaliation claim when he was fired because his fiancée engaged in a protected activity, filing a gender discrimination charge with the EEOC.  562 U.S. at 172.  The Court explained that the broad antiretaliation provision of Title VII, that prohibits any employer action that "well might have dissuaded a reasonable worker from making or supporting a [discrimination] charge," includes reprisals for close family

members. *Id.* at 174 (quoting *Burlington N. & S.F.R. Co. v White*, 548 U.S. 53, 68 (2006)).  Although the Supreme Court has not identified a "fixed class of relationships for which third-party reprisals are unlawful," it recognizes that firing a close family member will almost always meet this standard, whereas firing a mere acquaintance "will almost never do so." *Id.* at 175.

Similarly, in *Benison*, an employee brought a Title VII retaliation claim, alleging that she was fired by her employer (a university) because her spouse (a student) was involved in passing a no-confidence resolution against the universities President and Provost.  765 F.3d at 658.  Because the university did not dispute the spouse's standing, the Sixth Circuit assumed standing and addressed the merits of the retaliation claim.  *Id.*

Here, Title VII, and its broad anti-retaliation provision, is not present. Neither the Supreme Court nor the Sixth Circuit have extended third-party retaliation claims beyond Title VII.  This Court finds no analogous statutory authority with which to extend the third-party reprisal principle to this case.  Therefore, ordinary section 1983 standing principles apply and Reed lacks standing to allege that speech of Williams and the student editors is chilled.  This also means that *Coppola* and *Moore*, *supra* are contrary to the third party standing rule in the Sixth Circuit

Putting aside the second element of a First Amendment retaliation claim (that Reed suffered an injury that would likely chill First Amendment expression), plaintiffs are required to prove that the defendants were motivated, at least in part, by Reed's exercise of her constitutional rights.  Here we have a substantial dispute on the facts.

Plaintiffs claim that Reed's appointment was not approved because of her

14

advocacy for investigative journalism and journalist's rights.  Plaintiffs contend that defendants removed her to punish the North Wind for unflattering news coverage on the University.  On the other hand, defendants say in their affidavits that their vote was motivated by Reed being "abusive, needlessly confrontational and unbearably egotistical in her interactions" with Board members.  They also say that she was acting beyond her role as Advisor and impermissibly took on duties allocated to students.  This is a factual dispute that the court is not now in a position to resolve, having not heard any testimony.  The Court therefore cannot conclude that plaintiffs would likely (or not likely) be able to carry their burden of proof on this issue.  For this reason, and for the other reasons discussed above, it cannot be said that plaintiffs are likely to prevail on the merits.

### III

The remaining considerations for the Court's decision on injunctive relief do not outweigh the above considerations.  If plaintiffs' First Amendment rights were indeed violated, they would have suffered irreparable harm, upon denial of the injunction. *Elrod v. Burns*, 427 U.S 347, 373 (1976).  Moreover, it cannot be said that the requested injunction would result in great harm to Mr. Neiheisel, who is likely to remain the only defendant in this case if the case is not dismissed in its entirety.  However, the public interest would not be served if the Court were to issue an injunction that would not be legally sustainable.

### IV

Finally, injunctive relief that the Court could grant may well be ineffectual. Plaintiffs have sued four students and an NMU official.  These are five members of the

15

nine member Board who voted not to approve Reed.  Plaintiffs ask for a preliminary injunction requiring them to retain Reed.  Yet as set forth above, these students are not state actors, and cannot be enjoined.  In addition, one of the students is, according to his affidavit, no longer a student, and presumably no longer a member of the Board. Hence, even if the other students remain on the Board, they no longer command a majority.  Further, Reed's reinstatement is still subject to the re-submission of her name by the English Department (not a party to this case) and approval by the editorial staff (not parties to this case).  The only defendant in this case who is a state actor is Mr. Neiheisel.  He is in no position, as one member of the nine member Board, to reinstate Reed.

V

At this point it seems that this case is mostly sound and fury.   It really comes down to who is the North Wind?  The North Wind is the Board, along with the Editor it appoints, and the Journalistic Advisor it approves.  The Editor is responsible to the Board for editorial content.  The Journalistic Advisor is also responsible to the Board in that he/she is subject to annual approval.  The Board, and each of its members, have First Amendment rights as well as the plaintiffs.  If indeed the defendants were motivated in the action they took by the editorial content of the North Wind, they were only doing their job as required by the by-laws.  This case seems to have been spawned by what amounts to an editorial dispute between different people involved with the newspaper.  The dispute may well have been avoided if those involved, including Reed, had talked to each other during the school year, and tried to reach a consensus. Instead, we have the odd spectacle of a professor suing her students.  Much of the

16

complaint is directed at events which did not in any way involve the defendants. Plaintiffs seem to want this case framed as censorship of a student newspaper by a university.  That is simply not this case.

An order will enter denying the request for a preliminary injunction.


Dated:7/13/2015                              ___/s/ R. Allan Edgar_____
                                             R. ALLAN EDGAR
                                             UNITED STATES DISTRICT JUDGE